Good morning, Judge Persaud, Judge Garbus, and Judge Gould. May it please the Court, I am Jamie Lee Moore and I represent the appellant Nicholas Beaudreaux. I'd like to reserve two minutes of my time. Today I'm asking the Court for an unusual thing. I'm asking the Court to grant 2254 relief by reversing the convictions and remanding to state court. This case involves eyewitness identification. An eyewitness identification was omitted in this case. First we have remanded to the state court. What we do is write down the right to petition, conditionally and sexually. I'm sorry, Your Honor. Right to petition, conditionally and sexually. Correct, Your Honor. Thank you, Your Honor, for that clarification. So this is an eyewitness identification case, and when counsel gets an eyewitness identification case, the analysis always starts with was there any suggestibility. And that analysis begins with Foster v. California. And the reason it starts with Foster v. California is because it's the only U.S. Supreme Court case that has ever reversed a conviction based on suggested pretrial identification procedures. This is actually an IAC case, right? Correct, Your Honor. Correct. So the position or the relevance of the substantive law is somewhat different than it would be if we were going at it directly, right? Both as to how it applies to the trade law, i.e., the established Supreme Court law has to be the IAC law and not the substantive law. Correct, Your Honor. So it's viewed through a different standard of review, which is much more strict than it otherwise would, say, if this were a direct appeal. Your Honor, that's not what I'm saying. What I'm saying is that we don't, as I understand it, need to find a clearly established Supreme Court. We don't exactly need to find a clearly established Supreme Court law about the identification issue. What we need to find is a clearly established Supreme Court law about the IAC issue. Correct, Your Honor. All right. Strictly versus positive. And secondly, and this is something I wanted to ask you, is ultimately the strict and positive standard is whether there's a reasonable probability that the result would have been different. So do you have to demonstrate what the outcome would have been out of this false chronology you're making, or what reason you probably might have been, could have been? Right. That's what I'm asking you. Yeah. I'm not sure. I mean, the briefing seems to go into merits more than I am.  Well, I think the merits are critical for showing that defense counsel missed it. But on the prejudice issue, I don't think you need to demonstrate what the outcome would have been as opposed to what a reason you probably could have, might have been. I think we addressed that in the briefing by discussing the implication of California Penal Code Section 1111, which is similar to the code section that was at issue in Foster. Even though Foster was a direct appeal, whereby if there's an accomplice's testimony, it can't come in without something corroborating the fact that the defendant was at the scene of the crime so that it could be used. Is that what you're alluding to? Yeah. So, I mean, I think you're right. We need to show that counsel's error affected the reliability of the conviction. I think that's what the standard says. And so, whether we have to show what could have happened or what should have happened, I think if this testimony had been excluded, there's a good chance the accomplice's testimony would have never been allowed in as well under the California Penal Code Section. And so, the only thing left was the audio tape, which doesn't say anything really. It's not substantive. The audio tape, doesn't it say if you kept your mouth shut, we wouldn't be here? It does say that. But that doesn't. It doesn't sound like a 100% unequivocal admission. But it doesn't sound like it's an exculpatory statement. It's kind of an interesting statement. I think it says, it doesn't say that it's not exculpatory, but it's also not necessarily inculpatory. It's saying if you kept your mouth shut. Well, that's not the same as saying I was there, I did it, I was involved. It's just saying if you hadn't named me. Part of the problem with the audio tape is we don't really have the full context of that conversation because we can't hear all of it. So, I think. I hope you do. I'm sorry. I tried listening to it and I couldn't hear any of it, but I'm hearing. Yeah, I could hear bits and pieces, but not a whole bit more. What were you going to say, Judge Gail? So, could you please elaborate on one of the questions of interest to me, and that is, because I recognize ultimately our question is, IAC are ineffective systems of counsel. And so, the question is, was the procedure so informatively suggestive that the lawyer, a competent lawyer, should have objected to that? My question is, what's so suggestive about this procedure? They had the witness look at two photo arrays and have some argument. But the test you're primarily relying on for the impermissible procedure, the Foster case, is much more extreme in the sense that they have a witness who's 6'1", or I mean a line of character 6'1". The other guys who are 5'6 or so, and they have the target robber dressed in a leather coat like was worn by the robber that they're trying to convict. And, you know, Justice Fortas said it was almost. And they also do a face-to-face confrontation of just the one guy. And Justice Fortas said it was almost inevitable in those circumstances that there would be an IED. Yes, and I think that's analogous to the case we have here. I think that if counsel had looked, counsel would have found Foster, because it's been sitting, hiding in plain sight since 1969. It's the only case that's reversed on suggestibility. And the thing that's interesting about Foster, I briefed this, but what I think is so analogous and would have alerted counsel that he needed to file this motion, is that both times that the witness viewed the suspect in Foster, the witness said, you know, I'm not sure this is the guy. And then it was only the third time that he said, yeah, that's the guy. And the same thing happened here. In fact, the preliminary hearing testimony by Mr. Esho is interesting because he says, when I first saw the first lineup, and I said that Mr. Bidreau was the closest, I was pretty sure he wasn't the one at that point. He says, I was pretty sure he wasn't the one at that point. And that's in the record at excerpt page 1174. I think that's a significant point because it shows there's a buildup in his confidence based on the procedure. Because then six hours later, the sergeant brings another lineup with Mr. Bidreau's photo. It's unclear whether the other participants are the same or not. The photos are clearly different. I thought they said clearly that they weren't the same. I'm sorry? I thought the record wasn't that they were not the same. I think the record says that it's not the same, but when you look at the photos, it's unclear. So, yes, I think you're right. That's correct. It's a reference to not being at the same time. The photos are from different times. Yes, and Mr. Bidreau's photo was from an earlier time, which would have been closer to the incident. And at that point, witness at show also wasn't clear. But he also testified at the prelim that he may have, I mean, he recognized the photo. He recognized Mr. Bidreau as having been in the previous lineup. So it may have unconsciously, those are his words, influenced him to choose him again. But by that point, it's pretty clear that it's inevitable. But if he sees him a third time, just like in the Foster case, he's going to pick him, especially on the meeting. There was a lot of discussion, I mean, as to the representation. The lawyer later said that he had this terrible backache and that he should have recognized him, so he did. And one response to that, which I think was an interesting point of opinion, was, well, I mean, there was nothing in the record that he had the backache at the time he would have had to make a motion limiting. Is that true? That's actually not true. If you read the record, it's sort of in passing, but counsel did say, my back is killing me. And it's actually in the record. Let me see if I can find the page where he said that. But anyways, it's pre-trial and applied irrelevant. He was doing the motions and limiting, actually. So it was 1130 is the page number. So, again, this is a legal question. In terms of how we then review what the Court of Appeals did, I gather these statements were in the record that was before the State Courts in the 80s. Correct. So do we then look to whether a reasonable lawyer might have had a tactical reason for doing this or do we assume more that the State Court had to take into account the statement in some fashion? In other words, he says he didn't have a tactical reason. Right. How does that factor into the deference question essentially? I think you have to find that he did not have a strategic reason because he stated in his affidavit that he did not. Well, we're not going to find anything. The question is whether I need to assume that the State Courts decided on that basis or not. Or can we nonetheless say, well, the State Courts could have thought that a reasonable lawyer who was actually looking at the merits of this might have decided not to bring the motion. I don't think on this record that you have to do the State Courts' deference on that point. Only when you have a- In terms of the Supreme Court's decision, maybe it's on the Harrington case. Because when you don't have a written statement of what the reasons are for the decision like here, you have to assume if there's any reasonable interpretation that sustains what they did, that it can't reverse the DPA case. I thought that was Harrington. I agree with you. However, I don't disagree with your answer that just presided. We don't have to make that assumption. I mean, we might or might not have to make it, depending on whether it's reasonable. I agree with that. I think that it would have been objectively unreasonable, based on the record, for the Court of Appeal in the State Court to make that determination that counsel made a strategic decision or a reasonable attorney would have. Because counsel did submit an affidavit saying, I wasn't acting reasonably and I did not make a strategic decision. So, it would not be objectively reasonable to go there. And so, I think that answers your question. I'm way over time.  Thank you, Your Honor. This is your fault. So, we'll move into rebuttal. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'm very pleased to report this morning, Bruce Ortega of the California Attorney General's Office representing the respondents here. I want to begin with what Judge Kuhl just said. Under Richter, this Court determines what arguments or theories could have supported the State Court's decision. My question is, in the light of the fact that there is this statement in the record from the lawyer that he didn't make a tactical decision, or even consider the question, is it, do we attribute to the State Court ignoring that statement? In other words, can one of the reasonable conclusions be that even though the lawyer said that, the State Court decided that he really did make one? I have two responses, Your Honor. One, given the lawyer's affidavit, I don't think the State Court had to assume that he didn't have a tactical reason. He was telling the truth when he said, it was my back pain that kept me from making the motion. He also says in the declaration at page 125, I was pretty well prepared when we were assigned a courtroom in early June 2009. He hadn't been on the case for three months. It was June 29th, almost a month later, that he then says for the first time, my back has been killing me, and I just went to the emergency room over the weekend. Aside from whether his back was killing him or wasn't killing him, he did say specifically, I didn't make a decision. I did not make a tactical decision. Correct. But the State Court could also assume that even if that's true, had he made this motion, it would have failed. All right. That's a different question. That's all I'm trying to find here. Yes. Yes. Can they ignore the only thing in the record on whether he made a tactical decision? I think they can, because I think they can infer what the district court inferred, which is he's not telling the truth here. But let's assume the Court of Appeal and the State Court of Superior Courts that he's telling the truth. He didn't have a tactical reason. It doesn't matter, because even had he brought this motion, it would have failed. All right. So then I have, on that, I have the second level legal question that I was trying to ask before, and that is this. If the board has failed, it comes to a deprecious problem, right? Sorry, Your Honor. The board has failed, it comes to a deprecious problem. No, that comes in at the deficiency problem. Because you're not deficient if you fail to make a motion that would have failed. You're not deficient. But it's also, you're correct, it's also under the prejudice problem, because if you don't make a motion that would have failed, your client will find out. So I guess my question is, what does the board have failed mean? Does it mean that we now decide how we would have decided it? Or, as your brief says, and I thought your brief was, you know, was especially forthcoming for one of these cases. And one of the things that came across to me is what you were saying was not that, you know, it might be prone to prevail. Some judges might have agreed with it, but it likely would have failed. But that's not the standard, isn't it? Isn't the standard whether it's reasonably likely that it would have succeeded? So if there would have been a split, if some judges would have claimed it and some would have denied it, then it meets the Strickland standard as opposed to not meeting it? I don't think so. I think that goes to whether he would have been convicted or not had the motion succeeded. My view of the procedure is we'd love to see, would the motion have succeeded on the merits? Had trial counsel come forward and said, Foster demands that these in-court identifications be excluded. Meaning that we rule on that question on the merits rather than we decide whether a, whether there might have, whether different judges might have decided in different ways. I think it's the same thing because if a reasonable judge would have denied it, then under AEDPA. I don't think it's the opposite, though. Under Strickland, that's what I'm trying to get at. Under Strickland, it seems to me it's not whether a reasonable judge would have denied it, but whether there's a reasonable probability a reasonable judge would have claimed it. In which case, the evidence wouldn't have come in. My understanding is, I guess we're talking across purposes here. For crisis purposes. If you're right that it comes in under representation stage, that's different. But for crisis purposes, we're looking at it at the crisis stage. And it seems to me the question isn't whether a reasonable judge could have denied it. It's whether a reasonable judge could have granted it. I guess I disagree. I guess my view is we have to look first at efficiency. No, that's right. And I'm not sure why this comes in at the efficiency stage. The efficiency stage, well, I'll look at that. If it does, then I think you're right. If we're looking at it at the question stage, I think the question is flipped. Okay. Well, then, let's assume for purposes of argument that you're correct, that we would hold under Strickland there's prejudice because the motion would have succeeded. That one might have succeeded. It is reasonably probable that it might have succeeded. Okay. Then we have to go to the second part of the Strickland prejudice, which is, as Richter says, this does not require showing that counsel's action more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more probable than not standard is slight, and only matters in Tuerer's case. The likelihood of a different result must be substantial, not just conceivable. So then this court has to ask, okay, we had a deficient lawyer here who didn't bring this motion. This motion would have succeeded or could have succeeded. That evidence would not have been before the jury. Is there a substantial likelihood that the result had the SU identifications not been before the jury? More abundantly, the California Supreme Court has decided reasonably that he still would have been convicted, even absent the SU identifications. And I think, as just judged, I apologize for keep saying justice because I'm so used to the state court where you have it. But we have it, so there's no justice in my service. I do apologize for mine. As Judge Holmes stated, unfaithful statements in the ban, a powerful consciousness of guilt, which combined with Fowler's testimony. Well, I don't understand. If somebody was, if one guy went to the police and said the other guy did, and the other guy didn't do it, and was really angry, what, in this conversation, is he consistent with that scenario? Why should, if you had gone and told people that it was something that he didn't do, which it doesn't say, but it doesn't say it did or didn't do it, so why couldn't he have been equally angry about the fact that that guy had turned him in when he didn't do it? That's a reasonable interpretation of the evidence, but we know he was convicted. So I think the reasonable interpretation of the evidence is that it was consciousness of guilt. Or that Joey just did it as a wash. Well, Your Honor would have to say that no state court could have concluded. Well, there certainly is strong evidence of guilt. Let's put it that way. Given that statement. Not the evidence that he was really angry at this guy for turning him in. I think that because a reasonable state court could have concluded this was strong evidence of guilt, it would render harmless any, along with Fowler's testimony. Well, why could a reasonable state court have concluded that it was reasonable? That was strong evidence of guilt. Because we're under the ATPAA standards. Yes, I know. But tell me some reason why he started reading those statements to conclude that he had, that it was awareness of guilt as opposed to angry at somebody that turned him in to the police. He also says, respect my gangster. I think it means better be careful that you're not going to get hurt. All right. He turned me in to the police. I didn't do anything. I think that's consciousness of guilt, along with the other statements where he says, if you hadn't kept your mouth shut, we wouldn't be in this. Right. And I don't want to. I know. And I'm happy to plead for the statements. Yes, it is. Also could be consciousness of guilt. I see that. I've only got three seconds. So. Well. I never like to mention the merits of the foster issue. So if you want to address it. I think what I want to say about that is what Judge Gould said. This case is not fostered. Take a look at these two lineups, six photos, where it could be a fair identification, where the witness himself acknowledges he was told, I don't have a native identification. Those two lineups are not. Did he say that? He said I wasn't told I didn't have a native identification. And he signed at both times this, I'm about to show you a group of photographs. Look at each very carefully. This group of photos may or may not contain a photo of the person being investigated for this offense. And you are under no obligation to make identification. I think that, I think looking at the photos shows fairness. So I would say this case isn't foster. Or as Judge Gould said, in foster, the holding was identification procedures, one after another, were such that you could have only told the witness, this is the man. I don't think this case tells the witness, this is the man. And with that, I'll turn it over to you. Okay, thank you very much for your useful argument. We'll give you one minute to read it out. Thank you. Okay, just with this last minute that I have. I think the standard for counsels, assuming counsel was ineffective, the standard is whether counsel's conduct so undermined the proper functioning and the adversarial process that the trial cannot be relied upon as having produced a just result. That's a good answer. I think that's what we're talking about when we're looking at the standard that needs to be applied to counsel's conduct for purposes of determining whether there's prejudice, bias, failure to bring about justice. Will the effect reach the merits of the identification question as part of the issue of whether or not there was an infectiousness? I think it is. Yeah, I think it's inextricably intertwined. I know it is, but it's a question of do we decide on the merits as we would look at the question or do we decide as the state court would look at the question or do we decide at a stricter standard, i.e., whether a reasonable judge could have come out either way? What are we deciding exactly? I think you're deciding whether the state court had any objectively reasonable basis to determine that this claim did not have any basis, which is essentially what they did when they denied review. Did not have any basis? Well, that the claim is unfounded or that there is a claim, meaning that it's harmless. I think that's the standard that you're looking for. And so, our argument in the last few seconds that I have is that just couldn't happen. The council and the state courts and even the district court just missed Foster. Foster's sitting there in plain sight. It's not only analogous, but if you really focus on what Foster's about, which is the impact this adjustability has on the reliability of the identification, that's the crux. It's not just throughout the procedure. Yeah, and can you reason why this case is different from any other? I mean, there are all sorts of, you know, analyses now about any of the six facts being probable. But what makes this one, this case, different from a billion other cases in which identifications were based on six fact photo arrays? I submit that all five of the biggest factors point to unreliability in this case. I'm not as, I asked you a specific, it's good to ask a specific question, okay? The question is, how was the suggestibility of this catapult in this record? What makes it different and sufficiently suggestible? If we assume, as I believe is the case, that in general, asking somebody to pick somebody out of six fact is not utterly suggestible. So what are the key factors that are different here? The key factors are they've shown the witness the six fact. They've asked the witness to choose the closest. So that's suggested right away because it's assuming there's someone in there, in spite of the admonition that says he may or may not be in there. Patsy's testimony was, they told me to choose the closest. Esho chose the quote, unquote, closest. Six hours later. Do we know whether that's his handwriting on the bottom? It's not his handwriting. It's Sergeant Staten's handwriting, according to the record. Six hours later, the officer returns with another six fact. The only person that is in the first six fact and in the second six fact is Mr. Fitzgerald. Are there any cases out there that have the two arrays, but only one overlap situation? There's Foster. Foster is arguably more extreme. So I'm asking two photo arrays, you know, not an in-person stuff, but two photo arrays, only one overlap. Not that I'm aware of, Your Honor. I would need to conduct additional research. I'd be happy to do that and submit supplemental breaking up the part of the admissions. And with that, I will submit. Thank you very much. Thank you very much. All right. In the case of Buttreau versus Soto, all of the cities take their summary of all arguments. The next case, Convergence, will circle back. It's a great example. It's just going to show that. There's a reason. I'll ask again. Versus Storage National Bank. National System.
judges: Gould, Berzon, Garbis